UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE L. CLARK,

     Plaintiff,

                                    Case No.
v.                                  Hon.

FORD MOTOR COMPANY,
a Delaware corporation, and the
FORD MOTOR COMPANY
GENERAL RETIREMENT PLAN,
a qualified defined benefit plan,

     Defendants.

_____/

JOHN JOSEPH CONWAY (P56659)
JOHN J. CONWAY, P.C.
Attorney for Plaintiff
26622 Woodward Ave., Suite 225
Royal Oak, MI 48067
313-961-6525
jj@jjconwaylaw.com

_____/

## COMPLAINT

     PLAINTIFF ANDRE L. CLARK, by his attorneys, JOHN J. CONWAY, P.C.,

and for his Complaint against DEFENDANTS FORD MOTOR COMPANY, a

Delaware corporation, and the FORD MOTOR COMPANY GENERAL

RETIREMENT PLAN, a qualified defined benefit plan, states as follows:

### I.     NATURE OF THE ACTION AND JURISDICTION

     1.     This civil action is brought under the Employee Retirement Income

Security Act of 1974 ("ERISA,") 29 U.S.C. § 1001 *et seq.*, regarding various breaches and violations of the Act, and to compel the Defendants to provide promised retirement benefits to the Plaintiff in the amounts and at the levels promised, for injunctive relief, recovery and relief for surcharge and unjust enrichment, costs, and attorney fees incurred due to the Defendants' failure to do so.[1]

2.      This Court has jurisdiction pursuant to ERISA Section 502(e)(1), (f), 29 U.S.C. § 1132(e)(1), (f), and 28 U.S.C. § 2201, and Plaintiff has exhausted all required administrative remedies, or such remedies are futile, or the appeal is "deemed denied" according to the U.S. Department of Labor Regulations, specifically 29 C.F.R. § 2560.503-1.

3.      Venue is proper in this District pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), since Defendants' breaches took place in this jurisdiction; Defendants conduct and transact business in this jurisdiction; and Plaintiff resides in this jurisdiction. Additionally, Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201.

## II.      **THE PARTIES**

4.      Plaintiff Andre L. Clark ("Plaintiff" or "Mr. Clark") is currently an

---

[1] ERISA is principally codified at 29 U.S.C. § 1001 *et seq.* Many authorities (including some judicial opinions) cite only to the statute or the codification. For the Court's and the parties' convenience, this Complaint uses parallel citations to both.

employee of Defendant Ford Motor Company. Plaintiff is also a "participant" within the Ford Motor Company General Retirement Plan.

5.     Defendant Ford Motor Company ("Defendant Ford" or "Ford") is a Delaware corporation. Ford is the Plaintiff's "employer," as that term is used in ERISA, 29 U.S.C. § 1002(5), as well as the "plan sponsor" of the Plaintiff's employee pension plan, as that term is defined by ERISA, 29 U.S.C. § 1002(16)(B). Defendant is also "Plan Administrator," as that term is defined by ERISA, 29 U.S.C. § 1002(16)(A)(i).

6.     Defendant Ford Motor Company General Retirement Plan (the "Plan") is an "employee benefit pension plan" as that term is defined in ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A), and is the entity through which pension benefits are or may be paid to Plaintiff.

7.     The Plan defendant is a necessary party to accord the full relief sought herein.

8.     Defendants are "fiduciaries," as defined by ERISA, as they are responsible for determining the eligibility of participants and beneficiaries for benefits under the Plans under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

9.     All or a part of the wrongful conduct and/or transactions described herein occurred within the State of Michigan, and more specifically, in this District, where Defendants are regularly engaged in commerce and conduct business.

10.   All documents referenced herein are in the possession of Defendants.

### III.   GENERAL ALLEGATIONS

11.   Plaintiff realleges all preceding paragraphs.

12.   Plaintiff is, and was, at all relevant times, a "participant" within the meaning of the Employment Income Security Act of 1974 ("ERISA.")

13.   Plaintiff's participation status was provided through his employment with Defendant Ford.

14.   On December 14, 1986, Plaintiff became employed with Defendant Ford Motor Company, under the Vehicle Operations Manufacturing Engineering department.

15.   With more than 32 years of continuous employment, Plaintiff has been a consistent, critical element in Ford's automotive performance.

16.   Plaintiff's dedication to Ford is not encompassed in merely the amount of time he has been employed with the company – Plaintiff has given Ford his entire work life, sacrificing time with his family and loved ones to ensure Ford maintained its automotive market-position.

17.   Shortly into Plaintiff's employment, he developed a portable coordinate measurement machine, which utilized a new, proprietary process for measuring vehicles in the automotive industry.

18.   This was a precision measuring system in which Ford saw great

promise, and which was so innovative it was featured in the Manufacturing Engineering magazine, along with an interview with the Plaintiff.   *See*, **Exhibit 1**.

19.     In March 1991, Ford asked Plaintiff to move to Atlanta, Georgia to develop the precision measuring system at the Atlanta Assembly Plant.

20.     Plaintiff did so, uprooting his family and living in Atlanta for three years.

21.     In 1994, Plaintiff returned to Detroit, however a few years later, in 1998, Plaintiff was again asked to relocate, this time to Genk, Belgium, to launch the "Transit," with the promise of a promotion to relocate and then another when he returned.

22.     Plaintiff was promoted when he relocated to Europe; however, he never received another promotion upon his return to Detroit in 2001.

23.     Upon returning to Detroit, Plaintiff was essentially told that Ford needed him 'to do it again,' and he accepted an assignment with an out-of-town launch team in Kansas City.

24.     In 2003, Plaintiff moved on from Kansas City to lead the launch of the Aviator in St. Louis.

25.     Plaintiff was stationed at the St. Louis Assembly Plant until the plant was closed in 2004.

26.     Plaintiff was able to return to Detroit, Michigan for a brief period until

he was again transferred out of state to Chicago, Illinois, to lead the launch of the Lincoln MKS, beginning in 2007.

27.     Plaintiff returned to Michigan from Chicago in 2009 and his base of operations has been within the state of Michigan ever since.

28.     Plaintiff has, time and again, exhibited total dedication to this company during his lengthy tenure.

29.     Plaintiff has given his entire work life to Defendant Ford and sacrificed significant portions of his family life to serve this company.

30.      In return, one of the primary promises which was extended Plaintiff was the ability to retire securely.

31.     In furtherance of such, at the beginning of Plaintiff's employment, he elected to participate in the Contributory Service Fund ("CSF") which would deduct 1.5% from each of Plaintiff's paychecks and place those funds into the CSF on Mr. Clark's behalf, drawing, as of Plan year 2018, "120% of the Federal mid-term rate in effect on January 1st of the year."

32.     Upon information and belief, deductions were taken from Mr. Clark's paycheck, in accordance with the CSF, from his first paycheck received in 1986 until 2004.

33.     Plaintiff participated continuously in the CSF and at no time ever ceased his participation.

34.     At no point in his tenure did Plaintiff ever elect to "opt-out" from the CSF.

35.     In June 2017, Ford offered an opportunity to retire to select employees under what was termed the "Special Incentive Program" ("SIP").

36.     Under the SIP offer, which was essentially an early retirement "buyout" program, an employee who elected to retire would receive 18 months of salary in addition to any other retirement benefits available to them.

37.     For Plaintiff, this offer amounted to at least an additional $200,000.00 in value upon electing retirement.

38.     After review of the SIP offer, Plaintiff decided to elect to retire under its terms.

39.     Plaintiff placed a call to the National Employee Services Center ("NESC,") Ford's in-house benefit management company at the time, requesting pension calculations for his retirement, a standard practice.

40.     Plaintiff, after reviewing his projected retirement fund calculations, discovered the amounts differed considerably from that which he had projected based on his contributions and service.

41.     After carefully scrutinizing the calculations, Plaintiff identified the difference as being primarily attributable to the fact that contributions to the CSF ceased sometime in 2004 – along with any contributory service credit accrual.

42.     Plaintiff placed another call with the NESC, who informed him that its records were showing that he had "opted-out" of the CSF in 2004, a process which Plaintiff was informed required his submission of an "opt-out card," signed by him as the Participant.

43.     It was also during this call that the NESC representative informed Plaintiff that they had a copy of his signed opt-out card and would forward that to him.

44.     The sudden discovery of this error was problematic considering Plaintiff's SIP Package election-revocation deadline, which ran on July 31, 2017.

45.     On July 24, 2017, Mr. Clark notified the NESC, by email, of the impending revocation deadline and the resultant urgency to a resolution of the CSF matter.

46.     On July 25, 2017, Plaintiff sent a follow-up email to Ford Human Resources ("HR") that he would likely not receive a response from the NESC in time for appropriate action to be taken in the event of a denial.

47.     On July 31, 2017, Plaintiff met with Mr. Adam Blake, Ford's HR representative for the Vehicle Operations Manufacturing Engineering ("VOME") department.

48.     Mr. Blake informed Plaintiff that if he wanted to retire under the SIP offer, he would be accepting his current pension calculations as they were, however

if he revoked his election of the SIP offer, and remained employed with Ford, they would 'work on fixing it.'

49.     Plaintiff was left with little recourse but to withdraw his acceptance of the SIP offer and, on July 31, 2017, he signed the Revocation of Special Incentive Program Group Waiver and Release Agreement.

50.     At that point in time, Plaintiff also submitted a claim to Ford HR for the CSF contributions, credits, and interest from the period which he was mistakenly withdrawn from the program up to the present.

51.     Ford, and/or its agents' actions, in the position of a fiduciary, amounted to advising Plaintiff to forego retirement under the SIP offer so that the CSF issue could be resolved.

52.     Rather than receive an expedited decision, as Ford HR had suggested may occur, Plaintiff did not even receive acknowledgment of the receipt of his claim until August 7, 2017.

53.     In August of 2017, corresponding with Ford's acknowledgment of receipt of Plaintiff's claim for missing CSF contributions, without further explanation, CSF deductions from Plaintiff's paychecks resumed, in the amount of $163.71 per paycheck.

54.     Neither Defendant Ford, nor the NESC, provided any further explanation to Plaintiff as to why, from some point in time during 2004 until August

of 2017, deductions were not taken out of his paychecks, or why deductions had suddenly resumed.

55.     Near the end of October or the beginning of November 2017, Plaintiff spoke with an NESC representative regarding the status of his claim for CSF contributions and was only informed that the claim was still open and in process.

56.     A retirement buy-out package similar to the SIP offer was being offered to select Ford employees, including Plaintiff, in June 2018.

57.     Upon learning of this new buy-out package, Plaintiff, again, followed up with the NESC regarding the status of his claim and was informed that his claim had been closed, yet there was no available reason, final response, or other explanation related to the closure.

58.     On July 18, 2018, Plaintiff received a call from Mr. Ken Mitchell, Defendant Ford's pension manager, informing him that a letter denying his claim for CSF contributions had been issued in December of 2017 or January of 2018 (the "Initial Claim Denial Letter.")

59.     Plaintiff explained to Mr. Mitchell that he never received the Initial Claim Denial Letter, it had not been uploaded to the NESC portal, as was customary for employee benefits-related correspondence, nor had the NESC ever mentioned its existence – in fact there was nothing to suggest an NESC representative was ever aware of such a letter.

60.     The following day, Plaintiff followed up with the NESC, hoping to gain access to the Initial Claim Denial Letter.

61.     The NESC informed him that they still did not have access to any letter regarding a determination of his claim for CSF contributions.

62.     NESC representatives even asked Plaintiff to upload the Initial Claim Denial Letter through the NESC portal if he ever received it.

63.     On August 15, 2018, Plaintiff emailed a chronology of events to Mr. Mitchell, copying Mr. Blake.

64.     The Initial Claim Denial Letter, received by Plaintiff at some point in time between his July 18, 2018 discussion with Mr. Blake and his August 15, 2018 email to Mr. Mitchell, fails to set forth any discussion of Ford's investigatory findings regarding the cessation of CSF deductions or contributions on Plaintiff's behalf.

65.     Furthermore, the Initial Claim Denial Letter merely summarily states that Defendant Ford's "records indicate that you stopped contributing to the Plan on April 1, 2004. Therefore, we cannot grant you Contributory Service for any period in which contributions were not made to the Plan."

66.     Possibly, in response to Plaintiff's August 15, 2018 email, Ford quickly issued an Appeal Denial on September 6, 2018, which is a near duplicate of the Initial Claim Denial Letter.

67.     Again, there is no record of this document ever being uploaded to the NESC online portal.

68.     Underscoring this fact, Plaintiff never received an actual copy of this Appeal Denial until Ford mailed it to his legal counsel, received on March 6, 2019.

69.     Plaintiff also submitted a 21-page summary of his employment history with Ford, detailing not only the issues leading up to the claims in this Complaint, but also several other actions on the part of Ford and/or its agents which deprived him of career advancement opportunities and/or promised promotions.

70.     Plaintiff sought counsel after receiving a letter dated November 30, 2018 from Mr. Mitchell stating that the September 6, 2018 Appeal Denial was "final, conclusive and binding…."

71.     On January 21, 2019, Plaintiff's counsel issued an ERISA request for documents on behalf of Plaintiff to Defendant Ford.

72.     Most, if not all, of the documents requested were required to be supplied, by law, under ERISA Section 104, 29 U.S.C. § 1024, within 30 days.

73.     On February 14, 2019, Plaintiff's counsel's office received a telephone call from Ford's outside counsel, requesting a two-week extension to enable a complete response to the ERISA request for documents.

74.     Plaintiff's counsel granted the request for an extension, however also communicated to Ford's outside counsel that it lacked adequate documentation to

establish any deadline for any ERISA appeal still available to Plaintiff, and that the extension was contingent upon receiving confirmation from Ford of what date an ERISA appeal may be due.

75.    On March 6, 2019, Plaintiff's counsel submitted an ERISA appeal on behalf of Plaintiff to Ford.

76.    Plaintiff reserved his rights to supplement and timely filed his appeal.

77.    From the documentation available to Plaintiff's counsel, March 6, 2019 was Plaintiff's deadline to file an ERISA appeal.

78.    That same day, Plaintiff's counsel received the September 6, 2018 Appeal Denial Letter via mail from Defendant Ford.

79.    On March 12, 2019, Plaintiff's counsel received a response to its ERISA request for documents.

80.    On March 22, 2019, Plaintiff's counsel received correspondence from Ford confirming receipt of Plaintiff's ERISA appeal and stating that his request "to appeal will be heard at the next scheduled GRP Committee Meeting."

81.    Ford's response to Plaintiff's ERISA request for documents failed to rectify any outstanding, missing documentation and/or procedural irregularities presented by Ford's administration of Plaintiff's claim for pension benefits.

82.    Nothing within the response evidenced, or even suggested, the existence of *any* material even supporting an inference that Plaintiff ever opted out

of the CSF.

83.     Additionally, nothing within the response suggests an inquiry into the existence of an opt-out card signed by Plaintiff was ever made, let alone evidences the existence of such a card.

84.     Ford's written response to Plaintiff's written request for "Any and all evidence of [Plaintiff's] 'opting-out' of the Contributory Service Credit portion of the General Retirement Plan, including but not limited to a copy of a signed opt-out card" is illustrative:

> "Not provided. **This was not relied upon in, or otherwise submitted, considered, or generated in the course of, making the benefit determination**." (Emphasis added).

85.     Furthermore, Plan documents included in Ford's response to Plaintiff's ERISA request for documents indicate that the Retirement Committee's (the "Committee") upholding of the denial of Plaintiff's claim was contrary to the Plan's own terms.

86.     The Plan states that the Committee "shall not, however, take any action not uniformly applicable to all employees similarly situated."

87.     All communication from NESC representatives and Ford employees to Plaintiff have suggested that an opt-out card is a necessary predicate for a participant's enrollment in the CSF to be halted.

88.     Accordingly, through ratifying the denial of Plaintiff's entitlement to

missing CSF contributions and credits, despite the absence of an opt-out card, or any other document evidencing Plaintiff's election to opt-out of the CSF, the Committee took an "action not uniformly applicable to all employees similarly situated" – *i.e.*, it ratified the disenrollment of Plaintiff from the CSF *entirely absent* any evidence of his election to opt-out.

89.    All available documentation, as well as common sense, supports the idea that Plan participants are not disenrolled from the CSF absent their active election to opt-out.

90.    Thus, some documentary evidence of a Plan Participant's decision to opt-out of the CSF is required to be considered prior to disenrolling a Participant from the CSF.

91.    With zero evidence presented to the Committee of Plaintiff's decision to opt-out of the CSF, it should have exercised its power, under the Plan, to "correct any defect… or reconcile any inconsistency" and granted Plaintiff the entirety of his CSF contributions and credits.

92.    Rather, the Committee chose to deny Plaintiff pension benefits absent fulfillment of the standard of proof which is required for similarly situated employees.

93.    More than a violation of the Plan terms, this also constitutes a violation of ERISA Section 510, 29 U.S.C. § 1140.

94.     Also included with Ford's response to Plaintiff's ERISA document request was an Employee Benefits Committee Inter Office Memo (the "Memo,") prepared in advance of the Committee's September 2018 meeting, at which it presumably chose to ratify the denial of Plaintiff's claim.

95.     The Memo confirms the fact that Plaintiff requested a copy of any opt-out card bearing his signature.

96.     To this date, Ford has also failed to provide a copy of any notification sent to Plaintiff that he had been disenrolled from the CSF, or that it had received an election from him to opt-out of the CSF, despite such documentation being specifically requested in Plaintiff's ERISA request for documents.

97.     Accordingly, there is nothing in the Administrative Record to even suggest that a notice of Plaintiff either electing to opt-out of, or that he had been disenrolled from, the CSF was even generated, let alone sent to Plaintiff.

98.     On April 11, 2019, after receipt of Ford's ERISA demand response, Plaintiff's counsel sent a Supplement to Plaintiff's ERISA Appeal ("Supplement") via facsimile and certified mail, marked "Urgent: For Immediate Review by the Employee Benefits Committee."

99.     Shortly after transmission of Plaintiff's Supplement, Plaintiff's counsel received correspondence, dated April 8, 2019, from Ford stating that the Committee had "completed its review of your second appeal that was received on March 6,

2019… [and] has ruled to deny your appeal…."   (Hereafter referred to as the "Second Appeal Denial").

100.   Notably, despite stating that "Plan provisions do not permit you to receive Contributory Service credit for the period during which [Plaintiff] chose not to contribute to the Plan[,]" the Second Appeal Denial failed to provide any discussion and/or documentation evidencing Plaintiff *actually electing* not to contribute to the Plan.

101.   Nothing, in any correspondence or communication received by Plaintiff from any of the Defendants, identifies *a single provision* within the Plan which permits a Participant's participation in the CSF to be unilaterally discontinued, absent any election by a Participant, and without any communicated warning of the pending termination or notification of an effective opt-out.

102.   Defendants have carried out a deliberate and coordinated policy to deny Plaintiff his CSF benefits.

103.   Defendants' actions, as plan sponsors, administrators and fiduciaries, also constitute a violation of their fiduciary duties owed to Plaintiff to fairly and properly construe and interpret the Plans' language for the "exclusive purpose of providing benefits to participants and beneficiaries" as is required of claims administrators, insurers, and fiduciaries under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1).

104.   Furthermore, Defendants' actions in violation of their fiduciary duties have caused Plaintiff to miss out on two separate retirement buy-out programs and the resultant benefits of retiring under such programs.

105.   Defendants are laboring under an inherent structural conflict of interest.

## IV.   DEFENDANTS' VIOLATIONS OF ERISA

106.   ERISA requires every employee benefit plan to provide for one or more named fiduciaries who will have the "authority to control and manage the operations and administration of the Plan" ERISA Section 402(a)(1), 29 U.S.C. § 1102(a)(1).

107.   At all relevant times, Defendant Ford was a "fiduciary" within the scope of ERISA through its exercise of discretionary authority, control and responsibility over the design, implementation and administration of the Plan.

108.   As a matter of policy, Ford has wrongfully refused to credit Plaintiff with the entirety of contributions and credits promised to him under the CSF.

109.   Ford has intentionally misconstrued and/or ignored the terms of the Plan.

110.   Ford has failed to provide any evidence in support of its claims decision which asserts that Plaintiff elected to opt-out of the CSF.

111.   Instead, the real reason Ford does not want to credit Plaintiff with CSF contributions and credits which reflect his entire employment history is that it would be forced to admit administrative malfeasance.

18

112.   Ford's failure to provide evidence in support of its position constitutes a failure to provide full and fair review of the decision to deny benefits, in violation of ERISA Section 503(2), 29 U.S.C. § 1133(2).

113.   By administering the Plan in the manner described in this Complaint, Ford has failed to exercise the utmost loyalty and care of a prudent person engaged in similar activity under prevailing circumstances, in violation of ERISA.

114.   Plaintiff has exhausted all his administrative remedies.

## COUNT I
## ACTION TO RECOVER FULL PENSION BENEFITS AGAINST DEFENDANT FORD UNDER ERISA SECTION 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

115.   Plaintiff realleges all preceding allegations.

116.   Plaintiff is entitled to the proper credit and payment of pension benefits under the terms of his Plan.

117.   Defendant Ford has failed to credit Plaintiff with the entirety of CSF contributions and credits which he is entitled to, in accordance with the Plan and the documents under which the Plan is administered.

118.   Defendant Ford has failed to properly interpret its own plan language, despite Plaintiff's satisfaction of the Plans' eligibility requirements.

119.   Defendant Ford's failure to credit Plaintiff with his promised benefits is not based on a deliberate, principled reasoning process or substantial evidence, in violation of the Plan terms and ERISA.

120.    Further, Defendant Ford's rationale offered in support of its denial of Plaintiff's claim for pension credit is not supported by the terms of the Plan and is a violation of the Plan and ERISA.

121.    Defendant Ford has never supplied any documentation supporting its inherently unreasonable position – *i.e.,* that any employee would voluntarily opt out of a generous benefits program which is a key part of their retirement.

122.    Defendant Ford's decision is both incorrect and unreasonable.

123.    Defendant Ford is operating under an incurable conflict of interest.

124.    Accordingly, Plaintiff is entitled to immediate credit of full retirement benefits and entitled to clarify and enforce his rights to payment of those benefits through injunctive relief in accordance with the terms and guidelines of his Plan.

WHEREFORE, Plaintiff requests legal and equitable relief set forth above, including injunctive relief, in his favor and against Defendant Ford plus costs, interest, and attorney fees, equitable disgorgement, declaratory relief, and any other relief to which Plaintiff is entitled.

## COUNT II
## ACTION AGAINST DEFENDANTS UNDER ERISA SECTION 502(a)(3), 29 U.S.C. § 1132(a)(3) FOR EQUITABLE RELIEF

125.    Plaintiff realleges all preceding paragraphs.

126.    Plaintiff was promised, had earned, and was entitled to promised pension benefits, specifically contributions and credits under the "CSF."

127.   Defendant Ford knew, or should have known, that a long-tenured employee such as Plaintiff would be making retirement decisions based on information supplied to him by his plan.

128.   When it came time to irrevocably acknowledge and account for those earned contributions, credits, and interest, Defendant Ford falsely claimed that Plaintiff had requested an opt-out of the CSF.

129.   Those representations were false when made as Defendant Ford has provided zero evidentiary support for its contention that Plaintiff opted-out of the CSF.

130.   Defendant Ford's Retirement Benefit Committee, sitting in the role of a fiduciary, upon review of Plaintiff's claim for benefits, chose to willfully ignore the lack of evidence of Plaintiff opting-out of the CSF – *i.e.*, nothing suggests an inquiry was even made as to what documentation reflects that Plaintiff ever chose to opt-out of the CSF.

131.   Rather, the only explanation is that Plaintiff was (somehow) unilaterally disenrolled from the CSF at some point in time around April 1, 2004.

132.   In other words, Plaintiff's participation in the CSF was terminated in a manner which violated the terms and self-described administrative procedures of the Plan.

133.   Furthermore, Defendant Ford's failure to rectify the issue promptly, or

even within a two-year time frame, and ultimate *refusal*, has caused Plaintiff to forego enrollment in two separate buy-out programs.

134.   Defendants have been unjustly enriched by Ford's improper actions – their liability and required contributions under the CSF and multiple retirement buy-out programs were reduced as they simultaneously secured considerable, international contributions from an employee whose service spans three-decades.

135.   Owing to Defendant Ford's breaches of its duties as described herein, Plaintiff has been harmed, continues to be harmed, and will be harmed in the future, due to the acts or omissions detailed above.

136.   Therefore, Plaintiff respectfully requests, among other things, (1) the Court declare the Defendants have been unjustly enriched at the expense of Plaintiff and issue an order compelling Defendants to immediately credit, pay over or return to Plaintiff those benefits he earned while in the Plan, (2) that the Court declare Plaintiff entitled to retroactively elect the benefit plan offerings under the SIP and issue an order compelling Defendants to immediately credit, pay over or return to Plaintiff those benefits he would have been entitled to had he been able to finalize his election to retire under the SIP, and (3) provide other appropriate equitable relief necessary to redress Defendants' violations and to enforce the law and the Plan.

WHEREFORE, Plaintiff requests equitable relief set forth above, including injunctive relief, in his favor and against Defendants plus costs, interest, and attorney

fees, equitable disgorgement, declaratory relief, and any other relief to which Plaintiff is entitled.

## COUNT III
## ACTION UNDER ERISA SECTION 502(a), 29 U.S.C. § 1132(a) FOR BREACH OF FIDUCIARY DUTY AGAINST DEFENDANTS

137.   Plaintiff realleges all preceding paragraphs.

138.   Plaintiff was entitled to a fair and proper administration of his benefit plan by Defendants, all of whom are fiduciaries under ERISA.

139.    Defendants are laboring under an inherent conflict of interest owing to their actions with respect to Plaintiff in connection with their liabilities under the Plan, the CSF, and the SIP.

140.   Defendants have breached their fiduciary duties to Plaintiff and/or aided and abetted a breach of duties to Plaintiff.

141.   Defendants should be held personally liable for surcharge and unjust enrichment, as well as legally responsible for breaching their duties to Plaintiff for the conduct alleged herein.

WHEREFORE, Plaintiff requests full legal and equitable relief, including injunctive relief and surcharge, against Defendants plus costs, interest, and attorney fees, equitable disgorgement, declaratory relief, and any other relief to which Plaintiff is entitled.

## COUNT V
## ACTION AGAINST DEFENDANTS UNDER ERISA SECTION 502(a),
## 29 U.S.C. § 1132(a) FOR EQUITABLE ESTOPPEL

142.   Plaintiff realleges all preceding paragraphs.

143.   Defendants made a series of material misrepresentations to the Plaintiff concerning his rights under his benefit plan.

144.   Based on these material misrepresentations and admissions, Defendants induced justifiable reliance and/or a change in the legal position of the Plaintiff.

145.   Defendants' statements, and those of their agents, were clear and definite.

146.   Allowing the Defendants to avoid responsibility or liability for their representations would be inequitable.

147.   Accordingly, Defendants should be equitably estopped from denying that they are responsible for liability for all sums owed to Plaintiff.

WHEREFORE, Plaintiff requests full relief under ERISA, including appropriate equitable relief, injunctive relief against Defendants plus costs, interest, and attorney fees, equitable disgorgement, declaratory relief, and all other relief to which Plaintiff is entitled.

## COUNT VI
## ACTION UNDER ERISA SECTION 510, 29 U.S.C. § 1140
## INTERFERENCE WITH BENEFITS

148.   Plaintiff realleges all preceding paragraphs.

149.    Defendants insure and administer an ERISA qualified defined benefit plan under which Plaintiff is a Participant.

150.    Plaintiff met the Plan's coverage and eligibility provisions.

151.    Plaintiff attempted to file a claim for correction of earned pension credits with the Plan.

152.    Defendants, their agents, and delegated fiduciaries, acted with the intent to discriminate against Plaintiff in the provision of benefits and/or acted with the intent to interfere with and/or deprive Plaintiff of his benefits in violation of the ERISA statute and its protections thereunder and/or administered the Plan and rendered a final and binding benefits determination thereunder in a manner which was discriminatory and contrary to the terms of the Plan itself.

153.    The Plan itself specifically states that the Committee is not to "take any action not uniformly applicable to all employees similarly situated."

154.    This is a logical limitation on the Committee's decision-making – an action which is not uniformly applicable to all other employees constitutes *prima facie* discrimination.

155.    Plaintiff is entitled to full compensatory and equitable relief as a result of these actions.

WHEREFORE, Plaintiff requests judgment against Defendants adjudging that his right to benefits was interfered with, retroactive claims processing, all other

relief, interest, attorney fees, and all other appropriate relief, including reinstatement, to which this Court deems just.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests:

1.     An order compelling Defendant to credit Plaintiff forthwith the full amount of Contributory Service Fund contributions and credits due to him, including interest any such contributions and credits would have generated from their date of origination; and any and all such other legal or equitable relief as may be just and appropriate;

2.     An accounting and award of all benefits lost to date as a result of Plaintiff's inability to elect retirement under the Special Incentive Program and all costs and fees associated with pursuing that accounting;

3.     An award of reasonable attorneys' fees and costs pursuant to ERISA Section 502(g)(1), 29 U.S.C. § 1132(g)(1) for having to bring this claim; and

5.     Any and all such other legal or equitable relief as may be just and appropriate.


[SIGNATURES CONTINUED ONTO NEXT PAGE]

Respectfully submitted,

**JOHN J. CONWAY, P.C.**
Attorneys for Plaintiff
By:   /s/John J. Conway
John J. Conway
26622 Woodward Ave., Suite 225
Royal Oak, Michigan 48067
(313) 961-6525
jj@jjconwaylaw.com
P56659

Dated: May 13, 2019

27