UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE L. CLARK,

        Plaintiff,

v.

FORD MOTOR COMPANY and
FORD MOTOR COMPANY
GENERAL RETIREMENT PLAN,

        Defendants.

_____/

Case No. 19-cv-11410

Paul D. Borman
United States District Judge

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) (ECF NO. 15)

In this action, Plaintiff Andre L. Clark asserts claims against his former employer, Ford Motor Company ("Ford"), and the Ford Motor Company General Retirement Plan ("the Plan"), under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, for wrongful denial of benefits, equitable estoppel, breach of fiduciary duty, and interference with benefits. Plaintiff claims that Ford wrongfully refused to credit him with contributions to the Ford Contributory Service Fund ("CSF") from 2004 to 2017, resulting in reduced benefits under the Plan, and that Defendants' responses to his demands for these additional contributions, and his purported reliance on them, discouraged him from taking advantage of various separation programs and packages offered by Ford.

Defendants now move to partially dismiss Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiff's breach of fiduciary duty claim under ERISA Section 502(a)(2) (Count II) and his ERISA Section 502(a)(3) claim for equitable estoppel (in Count III) should be dismissed, and that his ERISA Section 502(a)(3) claim for breach of fiduciary duty (Count III) should be partially dismissed. This matter is fully briefed and the Court held a hearing on December 19, 2019. For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff's First Amended Complaint[1]

#### 1.    Plaintiff's Employment with Ford and Participation in the Plan

Plaintiff is a former Ford Motor Company ("Ford") employee and a Ford Motor Company General Retirement Plan (the "Plan") participant, having worked for Ford from December 1986 to May 2019. (ECF No. 14, First Amended Complaint ("FAC") ¶¶ 7, 17, 129-31.) At the beginning of Plaintiff's employment, he elected to participate in the Contributory Service Fund ("CSF"), a fund within the Plan, which would deduct 1.5% from each of Plaintiff's paychecks and place those funds

---

[1] The factual background is taken directly from the allegations of the Plaintiff's First Amended Complaint, and/or from the Exhibits attached to or referenced in the First Amended Complaint, and such facts are assumed to be true as required when the Court decides a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6).

into the CSF on Plaintiff's behalf as an investment for his retirement. (*Id.* ¶ 44.) According to Plaintiff, "[t]he [CSF] is the main element of Ford's secure-retirement promise to its employees," and the Plan's Summary Plan Description states: "Contributing to the Plan can significantly increase the amount of your retirement benefits. These increased benefits are not paid if you do not make contributions." (*Id.* ¶ 45.) Deductions were taken from Plaintiff's paycheck, in accordance with the CSF, from 1986 until April 2004, and then resumed in 2017. (*Id.* ¶ 46.) However, Plaintiff asserts that he believed he was a continuous participant in the CSF during the entirety of his employment with Ford. (*Id.* ¶ 47.)

### 2. The 2017 Ford "Special Incentive Program" Retirement Package

In June 2017, Ford offered select employees, including Plaintiff, the opportunity to voluntarily separate under its Special Incentive Program ("SIP"). (*Id.* ¶ 48.) Under the SIP, employees who elected to separate would receive, among other things, eighteen months of salary in addition to other separation benefits available to them. (*Id.* ¶ 49.) Plaintiff asserts that this offer amounted to at least an additional $200,000.00 in value upon electing retirement, and he initially accepted the SIP offer. (*Id.* ¶¶ 50-51.) Because the SIP "election documents included a full liability release," Plaintiff was advised to review his benefit calculations before signing. (*Id.* ¶ 52.) Plaintiff called Ford's in-house benefit management company, the National Employee Services Center ("NESC"), requesting a calculation of his

pension benefits. (*Id.* ¶ 53.) The benefits calculation was allegedly lower than Plaintiff projected. (*Id.* ¶¶ 54-55.) When Plaintiff called the NESC to discuss the calculation, he was informed that his CSF deductions ceased after March 2004 because records indicated that he had opted out of the CSF at that time. (*Id.* ¶¶ 57-58.) According to Plaintiff, prior plan documents stated that opting out of the plan requires written forms to disenroll from contributing to the CSF, stating in part: "You may stop your contributions by completing a form and returning it to your benefit representative." (*Id.* ¶ 59, citing Ex. 2 to FAC (Excerpt from the Ford Motor Company General Retirement Plan, dated November 1985), ECF No. 14-3, at 2, PgID 120.) The NESC representative told Plaintiff that they has a copy of his signed "opt-out" card and would forward that document to him. (FAC ¶ 58.)

Plaintiff's SIP Package election-revocation deadline expired on July 31, 2017. (*Id.* ¶ 60.) Plaintiff emailed the NESC regarding the impending deadline on July 24 and July 25 regarding the "urgency to a resolution of the CSF matter." (*Id.* ¶¶ 61-62.) He then met with Adam Blake, a Ford Human Resources representative, on July 31, who allegedly "informed Plaintiff that if he wanted to retire under the SIP offer, he would be accepting his current pension calculations as they were, however if he revoked his election of the SIP offer, and remained employed with Ford, they would 'work on fixing it.'" (*Id.* ¶¶ 63-64.) Plaintiff also wrote to Ford's Chairman, Bill Ford, to explain the situation and request assistance. (*Id.* ¶ 65.) Plaintiff

subsequently revoked his SIP acceptance that same day, without receiving a response. (*Id.* ¶ 66.)

### 3.    Plaintiff's Claim for CSF Contributions

At that same time, Plaintiff also submitted a claim to Ford HR for the missing CSF contributions and service credits, as well as interest from 2004 to July 2017. (*Id.* ¶ 67.) Ford acknowledged receipt of Plaintiff's claim on August 7, 2017, and his CSF deductions resumed in August 2017. (*Id.* ¶¶ 70-71.) In October or November 2017, Plaintiff spoke with a NESC representative and was informed that his claim for additional CSF benefits was "still open" and "in process." (*Id.* ¶ 73.)

### 4.    The 2018 Retirement Buy-Out Package and Denial of Claim for Benefits

In June 2018, Ford offered "select employees," including Plaintiff, another "buy-out package[] like the SIP [offer]." (*Id.* ¶ 75.) Upon learning of the new buyout package, Plaintiff asked the NESC about the status of his claim, at which time he was informed that it had been closed. (*Id.* ¶ 76.) Ken Mitchell, Ford's pension manager, informed Plaintiff by phone on July 18, 2018 that a letter denying his claim had been issued in December 2017 or January 2018 (the "Initial Claim Denial Letter"). (*Id.* ¶ 77.) Plaintiff alleges, however, that he never received the denial letter and that it had not been uploaded to the NESC portal which was intended to be used for employee benefits-related correspondence. (*Id.* ¶ 78.) In fact, upon further inquiry by Plaintiff, the NESC informed him that it did not have access to

5

any letter regarding a determination of his claim for CSF contributions. (*Id.* ¶ 80.) Plaintiff did not receive the Initial Claim Denial Letter until "at some point" in July or August 2018. (*Id.* ¶ 83.) The Initial Claim Denial Letter explained that Ford's "records indicate that you stopped contributing to the Plan on April 1, 2004," and that Ford could not grant "Contributory Service for any period in which contributions were not made to the Plan." (*Id.* ¶ 84.)

Ford's Retirement Benefit Committee (the "Committee") issued an appeal denial in September 2018, and a November 2018 letter informed Plaintiff that the appeal denial was "final, conclusive and binding." (*Id.* ¶¶ 85, 91.) After receiving the November 2018 letter, Plaintiff retained legal counsel, who issued an ERISA request to Ford for all relevant Plan communications and Plan documents. (*Id.* ¶¶ 91-92.) Plaintiff claims that he did not receive a copy of the September 2018 appeal denial until it was mailed to his legal counsel in March 2019 and that it "is a near duplicate of the Initial Claim Denial Letter." (*Id.* ¶¶ 85, 87.) In March 2019, Plaintiff filed a second appeal with the Committee, which was denied in an April 8, 2019 letter stating that "Plan provisions do not permit ... Contributory Service credit for the period during which [Plaintiff] chose not to contribute to the Plan." (*Id.* ¶¶ 96, 121-22.)

### 5. Plaintiff's Lawsuit and Termination

On May 13, 2019, Plaintiff filed this lawsuit. (ECF No. 1, Complaint.) On May 21, 2019, his employment with Ford was terminated through a group involuntary separation program, the 2019 Salaried Involuntary Reduction Process ("SIRP"), instituted as part of Ford's recently announced "Smart Redesign" initiative to reorganize the Company's salaried workforce. (FAC ¶¶ 129-32, 136-37.) Following an agreement between the parties and entry of a Stipulated Order by the Court (ECF No. 13), Plaintiff filed his First Amended Complaint on August 16, 2019, alleging four counts. (FAC.) In Count I, Plaintiff alleges that Ford violated ERISA § 502(a)(1)(B) by improperly denying him benefits through its decision to deny him "Credited Service Contributions toward his Contributory Benefit to which [he] is entitled." (*Id.* ¶¶ 162-73.) In Count II, he claims Ford breached its fiduciary duty to the Plan under ERISA § 502(a)(2) because it was allegedly "negligent in the initial administration of Plaintiff's Contributory Service Fund contributions and throughout the resulting internal administrative review process" and allegedly "unilaterally halted Plaintiff's contributions to the [CSF], without following the Plan's procedures and failing to ever notify Plaintiff of its actions." (*Id.* ¶¶ 174-85.) Count III alleges that Defendants breached their fiduciary duties to Plaintiff under ERISA § 502(a)(3), and that Ford should be equitably estopped "from denying that it is responsible for liability for all sums owed to Plaintiff." (*Id.* ¶¶ 186-226.)

7

Finally, Count IV asserts that Ford interfered with Plaintiff's benefits in violation of ERISA § 510 by discriminating against him in denying his claim and terminating him allegedly in retaliation for filing the present lawsuit. (*Id.* ¶¶ 227-44.)

## B. Defendants' Partial Motion to Dismiss

On August 30, 2019, Defendants filed their Partial Motion to Dismiss Plaintiff's First Amended Complaint. (ECF No. 15, Defs.' Mot.) Defendants argue that Plaintiff's ERISA § 502(a)(2) claim against Ford (Count II) fails as a matter of law because it is barred by the applicable statute of limitations. (*Id.* at 9-12, PgID 139-42.) Defendants also contend that Count II should be dismissed to the extent it challenges Ford's response to Plaintiff's claim for additional CSF contributions because it is duplicative of Plaintiff's ERISA § 502(a)(1)(B) claim in Count I. (*Id.* at 12-17, PgID 142-47.) Defendants assert that Plaintiff's equitable estoppel claim in Count III fails because Plaintiff fails to plead all essential elements of the claim; *i.e.,* a written material misrepresentation and extraordinary circumstances, and that Plaintiff's Count III ERISA § 502(a)(3) claim improperly relies, in part, on representations made by Ford agents in a ministerial, as opposed to a fiduciary, capacity. (*Id.* at 17-25, PgID 147-55.)

Plaintiff filed a response opposing Defendants' motion on September 27, 2019. (ECF No. 20, Pl.'s Resp.) He asserts that his ERISA § 502(a)(2) claim is timely, not duplicative, and necessary to accord "make whole" relief. (*Id.* at 10-21,

8

PgID 261-72.) He also argues that he has adequately pleaded an equitable estoppel claim, and that Defendants' motion should be denied. (*Id.* at 21-25, PgID 272-76.)

On October 18, 2019, Defendants filed their reply in support of their motion to dismiss, reasserting the arguments made in their opening motion. (ECF No. 21, Defs.' Reply.)

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (citation omitted). To state a claim, a complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than a "formulaic recitation

9

of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has explained that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice, (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records,

matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co.*, 258 F.Supp.2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

## III.   ANALYSIS

### A.   The Timeliness of Plaintiff's ERISA § 502(a)(2) Claim (Count II)

Defendants assert that Plaintiff's breach of fiduciary duty claim against Ford under Section 502(a)(2) is based upon two alternative theories; namely, that Ford breached its fiduciary duty to Plaintiff when it: (1) ceased Plaintiff's CSF deductions beginning in 2004; and (2) failed to retroactively credit him with additional CSF contributions after he challenged the unmade deductions. (Defs.' Mot. at 9, PgID 139.) Defendants contend that this claim "arose in 2004," when the CSF deductions

11

admittedly stopped, and that Plaintiff had "actual knowledge" of this claimed wrong because the "absence of the CSF deduction would have appeared on the face of Plaintiff's paycheck and necessarily resulted in an increase in his net pay[.]" (*Id.* at 10-11, PgID 140-41.) Defendants argue that "Plaintiff cannot sleep on his rights for over a decade, enjoying increased pay, and then file suit against Ford now that stopping the CSF deductions has 'become painful.'" (*Id.* at 12, PgID 142, citing *Wright v. Heyne*, 349 F.3d 321, 330 (6th Cir. 2003).)

Plaintiff responds that he first discovered the missing CSF contributions in July 2017, when the NESC communicated his diminished pension amount, and that he "sprang into action immediately after being notified of the error in his pension calculations[.]" (Pl.'s Resp. at 11-12, PgID 262-63.) He asserts that Ford did not provide notice to him of his "disenrollment" in the fund and that "[n]owhere does [his] Complaint suggest Ford provided him with physical paychecks, that he had access to the entirety of his paychecks, or that his paychecks provided any indication that his contributions had stopped." (*Id.*) Plaintiff concludes that he was not aware of the problem with his benefits, therefore, until "at the earliest, 2017." (*Id.* at 18, PgID 269.)

Under ERISA, when a fiduciary breaches an obligation or duty, the victim of the breach normally has six years "from the date of the last action which constituted a part of the breach or violation" in which to file suit. 29 U.S.C. § 1113(1).

12

"However, a 'plaintiff with actual knowledge of a non-fraudulent breach of fiduciary duties must file suit within three years.'" *Wright*, 349 F.3d at 327 (quoting *Tassinare v. American Nat'l Ins. Co.*, 32 F.3d 220, 223 (6th Cir. 1994)); *see also* 29 U.S.C. § 1113(2). In the Sixth Circuit, "actual knowledge" means "knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute." *Wright*, 349 F.3d at 330; *see also id.* at 331 ("[I]t is only the plaintiff's actual knowledge of the underlying conduct giving rise to the alleged violation that is required, rather than the knowledge that the underlying conduct violates ERISA."). This view "furthers the policies underlying statutes of limitations" including "preventing plaintiffs from sleeping on their rights and prohibiting the prosecution of stale claims." *Id.* at 330 (citations omitted).

In the Sixth Circuit, "[a]ctual knowledge does not 'require proof that the [Plaintiff] actually saw or read the documents that disclosed'" the alleged harmful conduct. *See Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 571 (6th Cir. 2010) (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp.2d 416, 419 n.3 (S.D.N.Y. 2008) (holding that the plaintiffs had actual knowledge of an alleged failure to diversify plan investments when they were provided with plan documents that described the investments as undiversified, regardless of whether the

13

plaintiffs "actually saw or read the documents"), *aff'd on other grounds*, 325 F. App'x 31 (2d Cir. 2009)).[2]  In *Brown*, the Court found that merely providing plaintiffs access to the relevant documents is enough to supply actual notice. *Id.* ("[W]e see no material distinction between being directly handed plan documents and being given instructions on how to access them.  When a plan participant is given specific instructions on how to access plan documents, their failure to read the documents will not shield them from having actual knowledge of the documents' terms.") (citing *Shirk v. Fifth Ward Bancorp.*, No. 05-cv-049, 2009 WL 3150303, at *3 (S.D. Ohio Sept. 30, 2009) ("[B]ecause Plaintiffs' actual knowledge runs from the date that documents were provided, *or made available*, to Plan Participants disclosing the facts underlying the alleged breach of fiduciary duty, Plaintiffs cannot avoid the bar of ERISA's three year statute of limitations by merely claiming that

---

[2] As Defendants point out in their motion, the Ninth Circuit recently departed from this view in *Sulyma v. Intel Corp. Inv. Policy Comm.*, 909 F.3d 1069, 1076 (9th Cir.), *cert. granted*, 139 S.Ct. 2692 (2019).  The Supreme Court granted certiorari on the issue of "[w]hether the three-year limitations period in Section 413(2) of the Employee Retirement Income Security Act, 29 U.S.C. 1113(2), which runs from 'the earliest date on which the plaintiff had actual knowledge of the breach or violation,' bars suit where all of the relevant information was disclosed to the plaintiff by the defendants in statutorily mandated disclosures more than three years before the plaintiff filed the complaint, but the plaintiff chose not to read or could not recall having read the information."  Oral argument was held on December 4, 2019. *See Intel. Corp. Inv. Policy Comm. v. Sulyma* (No. 18-1116).  Until the Supreme Court renders its decision in *Sulyma*, this Court is bound by the Sixth Circuit's controlling decision in *Brown*.

they did not read the documents that form the basis for their claims.") (emphasis added)).

The "underlying conduct" at issue here is the cessation of Plaintiff's contributions to the CSF through payroll deductions, which happened beginning in 2004. Plaintiff contends that Ford "unilaterally halted" the contributions by "remov[ing] Plaintiff as a participant" "without notice," and thereby was "negligent in the initial administration" of his CSF contributions. (FAC ¶¶ 177-78, 180.) The issue is when Plaintiff became "aware" or is deemed to have "actual knowledge" of that conduct sufficient to trigger the three-year statute of limitations. Defendants contend that "the absence of the CSF deduction would have appeared on the face of Plaintiff's paycheck and necessarily resulted in an increase in his net pay" and thus Plaintiff "must have known" that the CSF deductions ceased in 2004. (Defs.' Mot. at 11, PgID 141.) Plaintiff contends that he did not notice the cessation of such deductions until July 2017. (Pl.'s Resp. at 11, PgID 262.) Plaintiff pleads in his First Amended Complaint that he elected to participate in the CSF and have salary deductions taken "from each of [his] paychecks" and placed in the CSF, and that, "[u]pon information and belief, deductions were taken from [Plaintiff's] paycheck, in accordance with the CSF, from his first paycheck received in 1986 until April 2004 – and then resumed in 2017." (FAC, ¶¶ 44, 46.) Plaintiff further pleads, however, that he "had believed that he was a continuous participant in the CSF and

15

at no point in his tenure did [he] ever elect to 'opt-out' of the CSF, which is required by Ford to discontinue participation in that portion of the Plan." (*Id.* ¶ 47.)

Defendants rely on *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516 (6th Cir. 2008) in support of their motion, but that case is distinguishable. In *Bishop*, the plaintiff/retirees alleged that Lucent officials represented to plaintiffs in 2000 that "there was no point in delaying their retirement in the hope that the company would offer special retirement incentives like those offered by Lucent in the past, because Lucent had decided not to offer packages again in the future, a prospect the officials guaranteed the company had specifically ruled out." *Id.* at 518. Plaintiffs retired at that time. *Id.* However, six months later, on June 11, 2001, Lucent publicly announced the offering of a lucrative severance package known as the 2001 Voluntary Retirement Program ("VRP"). *Id.* Plaintiffs subsequently brought suit on January 3, 2005, claiming "that defendants breached fiduciary duties 'by actively misleading them into choosing to retire when they did with false information about the company's policy and intentions with respect to severance initiative.'" *Id.* Defendants filed a motion to dismiss, contending that the claims are barred by the statute of limitations because the plaintiffs had actual knowledge of the alleged breach of fiduciary duty on the date of the pubic VRP announcement on June 11, 2001, and that the three-year limitations period had therefore expired almost seven months before the complaint was filed. *Id.* The Sixth Circuit affirmed the district

16

court's dismissal of the plaintiff's claims on statute of limitations grounds because although the complaint was silent as to *when* the plaintiffs first acquired actual knowledge, it did contain affirmative allegations (that the VRP was publicly announced on June 11, 2001) "which, on their face, give rise to the reasonable inference that [plaintiffs] must have known, at the time of the public announcement of the 2001 VRP that they had been wronged." *Id.* at 520 ("When it affirmatively appears from the face of the complaint that the time for bringing the claim has passed, the plaintiff cannot 'escape the statute by saying nothing.'").

Conversely, in this case, Plaintiff affirmatively pleads that he "believed that he was a continuous participant in the CSF and at no point in his tenure did [he] ever elect to 'opt-out' of the CSF, which is required by Ford to discontinue participation in that portion of the Plan," and that he first learned of that the CSF contributions had stopped when he was informed by the NESC in July 2017. (FAC, ¶¶ 47, 53-57.). Thus, unlike in *Bishop* (where the plaintiff pleaded that the VRP was publicly announced in 2001), it does not "appear[] from the face of the [First Amended C]omplaint" that Plaintiff had "actual knowledge of the facts or transaction comprising the wrong complained of more than three years before the complaint was filed." *See Bishop*, 520 F.3d at 520. While Defendants argue that it is "simply implausible that Plaintiff was unaware that his pay had increased after he stopped participating in the CSF in the absence of deliberate efforts to remain uninformed"

17

(Defs.' Reply at 2, PgID 310), on a motion to dismiss, the Court must accept Plaintiff's well-pleaded allegations in the complaint as true and construe them in the light most favorable to Plaintiff. *See Handy-Clay*, 695 F.3d at 538. Here, Plaintiff expressly pleads that he "believed he was a continuous participant [in the CSF]" that he first learned in July 2017 that his CSF contributions were not being credited after March 2004, that he did not "elect to 'opt-out' of the CSF," that "Ford failed to provide a copy of any notification sent to Plaintiff that he had been disenrolled from actively contributing to the CSF," and that "there is nothing in the claims file to even suggest that a notice of Plaintiff either electing to opt-out of, or that he had been disenrolled from, actively contributing to the CSF was even generated, let alone sent to Plaintiff." (FAC ¶¶ 47, 117-18.) Although Defendants might be correct that Plaintiff's paychecks starting in 2004 provided notice that CSF deductions were no longer being made, thus triggering the three-year statute of limitations, without allegations in the FAC supporting that assumption, or otherwise evidence of what is contained on the face of those paychecks, that is just supposition. This issue may be better resolved on summary judgment, after discovery and production of Plaintiff's paycheck information before and after 2004.

Accordingly, Defendants' motion to dismiss Count II of the FAC as barred by the three-year statute of limitations is DENIED.

## B. "Repackaged" ERISA § 502(a)(2) Claim (Count II)

Defendants argue that, to the extent Plaintiff attempts to characterize his fiduciary duty claim in Count II as challenging Ford's later denial of his request for CSF credit, rather than its underlying removal of him from the program, that claim is no more than a repackaged ERISA § 502(a)(1)(B) denial-of-benefits claim and should be dismissed. (Defs.' Mot. at 12-17, PgID 142-47.) Defendants contend that "a plaintiff cannot bring a fiduciary breach claim under Section 502(a)(2) where a denial-of-benefits claim would afford plaintiff complete relief." (*Id.* at 14, PgID 144.) Plaintiff responds that his § 502(a)(2) claim is for plan-wide relief and is not duplicative of his § 502(a)(1)(B) claim for individual relief, and therefore should not be dismissed. (Pl.'s Resp. at 18-21, PgID 269-72.)

29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), permits suits "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." Section 1109, ERISA § 409, provides that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good *to such plan* any losses *to the plan* resulting from each such breach, and to restore *to such plan* any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

(emphases added). The duties imposed by § 409 on fiduciaries "relate to the proper management, administration, and investment of fund assets, with an eye toward

19

ensuring that the benefits authorized by the plan are ultimately paid to participants and beneficiaries." *LaRue v. DeWolff, Boberg & Assoc., Inc.*, 552 U.S. 248, 253 (2008) (internal quotation marks omitted). Thus, although an individual plan participant may bring suit under ERISA § 502(a)(2), he or she may do so only for losses inflicted upon the plan itself. *Id.* at 256.

In contrast, § 1132(a)(3), ERISA § 502(a)(3), permits plaintiffs to assert fiduciary duty claims *on their own behalf* to obtain "appropriate equitable relief." Section 502(a)(3) has been termed the "catchall" section, and the Supreme Court has held that recovery under § 502(a)(3) is *only* available where Congress has not "elsewhere provided adequate relief for a beneficiary's injury," because when other adequate relief is available, equitable relief "normally would not be 'appropriate.'" *Varity Corp. v. Howe*, 516 U.S. 489, 512, 515 (1996) (noting that § 502(a)(3) "functions as a safety net" and only authorizes "'*appropriate*' equitable relief" "for injuries caused by violations that § 502 does not elsewhere adequately remedy") (emphasis in original). The Sixth Circuit has clarified that "the availability of relief under § 502(a)(3) is contingent on a showing that the claimant could not avail himself or herself of an adequate remedy pursuant to § 502(a)(1)(B)." *Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 372-73 (6th Cir. 2015) (en banc). Therefore, courts have held that a plaintiff may not "repackage" a denial-of-benefits claim under § 502(a)(1)(B) as a § 502(a)(3) fiduciary breach claim. *See Gore v. El Paso*

20

*Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 842 (6th Cir. 2007). "Impermissible repackaging is implicated whenever, in addition to the particular adequate remedy provided by Congress, a duplicative or redundant remedy is pursued to redress the same injury." *Rochow*, 780 F.3d at 373. Thus, a plaintiff "can pursue a breach-of-fiduciary duty claim under § 502(a)(3), irrespective of the degree of success obtained on a claim for recovery of benefits under § 502(a)(1)(B), only where the ... claim is based on an *injury* separate and distinct from the denial of benefits or where the remedy afforded by Congress under § 502(a)(1)(B) is otherwise shown to be inadequate." *Id.* at 372 (emphasis in original); *see also Gore*, 477 F.3d at 838-42 (holding that a plaintiff could simultaneously obtain relief under § 502(a)(1) and § 502(a)(3), but only because recovery under the former would not provide adequate relief); *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2005) (allowing putative class action challenging the plan-wide claims-processing methodology to proceed under §§ 502(a)(1) and 502(a)(3)); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 418 (6th Cir. 1998) (allowing challenge to plan-wide methodology for computing benefits).

As Defendants assert, while *Varity* and its Sixth Circuit progeny were decided under § 502(a)(3), courts in this district and elsewhere in the Sixth Circuit have similarly concluded that a plaintiff cannot bring a fiduciary breach claim under § 502(a)(2) where a denial-of-benefits claim would afford the plaintiff complete relief.

21

(Defs.' Mot. at 14, citing *Johns v. Blue Cross Blue Shield of Mich.*, No. 2:08-CV-12272, 2009 WL 646636, at *7 (E.D. Mich. Mar. 10, 2009) (Murphy, J.) (regarding plaintiff's "§ 1132(a)(2) claim as another attempt to repackage his denial of benefits claim," and stating that "[t]he proper remedy for breaches of fiduciary duty that take the form of denials of plan benefits is therefore a suit under § 1132(a)(1)(B)"); *Crider v. Life Ins. Co. of N. Am.*, No. 3:07-CV-331-H, 2008 WL 2782871, at *2 (W.D. Ky. July 15, 2008) ("Because Crider's complaint does not allege systemic, plan-wide claims-administration problems or a claim as in *Gore* which is "distinct and unrelated" to her claim for benefits she fails to state a separate claim for breach of fiduciary duty pursuant to § 502(a)(2) and the ERISA remedy for the injury she alleges is that specified in § 502(a)(1)."))[3] Defendants reason that "[a]pplying the same rule to both Section 502(a)(2) and Section 502(a)(3) is supported by the text,

---

[3] Contrary to Plaintiff's assertion that the Sixth Circuit in *Hitchcock v. Cumberland University 403(b) DC Plan*, 851 F.3d 552 (6th Cir. 2017) "actually *endorsed* the pleading of §§ 502(a)(1)(B) and (a)(2) claims simultaneously" (Pl.'s Resp. at 18-19, PgID 269-70), that decision instead addressed the question of whether plaintiffs were required to exhaust their administrative remedies for their suit "directed to the *legality* of a plan" (the retroactive application of an amendment) and not to the "mere *interpretation* of it." *Id.* at 562 (emphases in original). The Sixth Circuit held that "(1) there is no exhaustion requirement for ERISA claims alleging statutory, rather than plan-based, violations, and (2) Counts II [anti-cutback violation] and IV [breach of fiduciary duty] assert statutory violations not subject to the exhaustion requirement." *Id.* at 564. The Court went on to note that "this statutory claims exception does not apply to 'plan-based claims "artfully dressed in statutory clothing," such as where a plaintiff seeks to avoid the exhaustion requirement by recharacterizing a claim for benefits as a claim for breach of fiduciary duty." *Id.* at 565 (citations omitted).

structure, and purpose of ERISA's provisions" because "[l]ike Section 502(a)(3),

Section 502(a)(2) claims are limited to "appropriate" relief. (Defs.' Mot. at 14, PgID

144.) As Chief Justice Roberts explained in his concurrence in *Larue v. DeWolff,*

*Boberg & Associates, Inc.*, 552, U.S. 248 (2009):

> If LaRue may bring his claim under § 502(a)(1)(B), it is not clear that
> he may do so under § 502(a)(2) as well. Section 502(a)(2) provides for
> "appropriate" relief. Construing the same term in a parallel ERISA
> provision, we have held that relief is not "appropriate" under §
> 502(a)(3) if another provision, such as § 502(a)(1)(B), offers an
> adequate remedy. *See Varity Corp. v. Howe,* 516 U.S. 489, 515, 116
> S.Ct. 1065, 134 L.Ed.2d 130 (1996). Applying the same rationale to an
> interpretation of "appropriate" in § 502(a)(2) would accord with our
> usual preference for construing the "same terms [to] have the same
> meaning in different sections of the same statute," *Barnhill v. Johnson,*
> 503 U.S. 393, 406, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), and with
> the view that ERISA in particular is a "'comprehensive and reticulated
> statute'" with "carefully integrated civil enforcement provisions,"
> *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105
> S.Ct. 3085, 87 L.Ed.2d 96 (1985) (quoting *Nachman Corp. v. Pension
> Benefit Guaranty Corporation,* 446 U.S. 359, 361, 100 S.Ct. 1723, 64
> L.Ed.2d 354 (1980)). In a variety of contexts, some Courts of Appeals
> have accordingly prevented plaintiffs from recasting what are in
> essence plan-derived benefit claims that should be brought under §
> 502(a)(1)(B) as claims for fiduciary breaches under § 502(a)(2). *See,
> e.g., Coyne & Delany Co. v. Blue Cross & Blue Shield of Va., Inc.,* 102
> F.3d 712, 714 (C.A.4 1996). Other Courts of Appeals have disagreed
> with this approach. See, *e.g., Graden v. Conexant Systems Inc.,* 496
> F.3d 291, 301 (C.A.3 2007).
>
> The significance of the distinction between a § 502(a)(1)(B) claim and
> one under § 502(a)(2) is not merely a matter of picking the right
> provision to cite in the complaint. Allowing a § 502(a)(1)(B) action to
> be recast as one under § 502(a)(2) might permit plaintiffs to circumvent
> safeguards for plan administrators that have developed under §
> 502(a)(1)(B). Among these safeguards is the requirement, recognized
> by almost all the Courts of Appeals, see *Fallick v. Nationwide Mut. Ins.*

*Co.,* 162 F.3d 410, 418, n. 4 (C.A.6 1998) (citing cases), that a participant exhaust the administrative remedies mandated by ERISA § 503, 29 U.S.C. § 1133, before filing suit under § 502(a)(1)(B). Equally significant, this Court has held that ERISA plans may grant administrators and fiduciaries discretion in determining benefit eligibility and the meaning of plan terms, decisions that courts may review only for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

These safeguards encourage employers and others to undertake the voluntary step of providing medical and retirement benefits to plan participants, *see Aetna Health Inc. v. Davila,* 542 U.S. 200, 215, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004), and have no doubt engendered substantial reliance interests on the part of plans and fiduciaries. Allowing what is really a claim for benefits under a plan to be brought as a claim for breach of fiduciary duty under § 502(a)(2), rather than as a claim for benefits due "under the terms of [the] plan," § 502(a)(1)(B), may result in circumventing such plan terms.

*LaRue,* 552 U.S. at 258-59 (Roberts, C.J., concurring).

Here, to the extent Plaintiff seeks additional CSF contributions in Count II of his FAC ("losses to Plaintiff's individual retirement account" (FAC ¶ 185)), Plaintiff's § 502(a)(2) claim fails because he is not seeking restoration of losses to the Plan itself, which is a required element for an actionable § 502(a)(2) claim. The Supreme Court made clear that the touchstone of this analysis if whether Plaintiff's claims seek to "protect the financial integrity of the plan" by challenging "fiduciary breaches that impair the value of plan assets...." *LaRue,* 552 U.S. at 254, 256. Plaintiff's FAC does not allege systemic, plan-wide claims administration problems or a claim for CSF credit which is "distinct and unrelated" to his claim for benefits. Instead, this claim is duplicative of his denial-of-benefits claim in Count I because

it seeks identical relief for the same injury. (Compare FAC ¶¶ 170, 173 (seeking "immediate credit of full Contribution, Contributory Service Credits, and retirement benefits") with ¶ 185 (seeking, in part, "to repair all losses to Plaintiff's individual retirement account").)

Further, while the FAC also broadly pleads that the "Plan is underfunded relative to the sum-total of deductions for which Ford unilaterally halted [from Plaintiff] – as well as any interest which may have accrued thereon," and requests, in the alternative, "any losses which the Plan may accrue as a result of the lack of contributions" (FAC ¶¶ 180, 185), the Complaint fails to specify what those "losses" would be. Plaintiff suggests in his response brief that, if he prevailed on his denial-of-benefits claim, other Plan participants would automatically receive lower benefits because their assets would be diverted to compensate Plaintiff. (Pl.'s Resp. at 20-21 & n.7, PgID 271-72.) Defendants counter that Plaintiff provides no support for this "naked—and inaccurate—assertion," and explain that, in fact, the Plan provides that Ford "intends to make contributions to the Retirement Fund sufficient to provide the benefits payable ... which shall not be provided by the Members' contribution to the Fund." (Defs.' Reply at 4-5, PgID 312-13, citing Ex. A., Ford Motor Company General Retirement Plan, December 31, 2016, at PgID 320.) Therefore, it appears that if Plaintiff did recover benefits associated with his claim, those benefits would not be diverted from specifically allocated benefits of other Plan participants, but

rather would be from "contributions to the Retirement Fund sufficient to provide the benefit payable" by Ford.

Accordingly, Defendants' motion to dismiss Plaintiff's claim under ERISA § 502(a)(2) in Count II, to the extent it challenges Ford's denial of his request for additional CSF contributions, is GRANTED and that claim is DISMISSED because it is duplicative of Plaintiff's ERISA § 502(a)(1)(B) claim in Count I.

## C. Plaintiff's Equitable Estoppel Claim (Count III)

Plaintiff claims that Ford should be "equitably estopped from denying that it is responsible for liability for all sums owed to Plaintiff," including credit for his Contributory Service, because of Ford's alleged representations. (FAC ¶¶ 218, 223, 225.) The representations Plaintiff complains of include Blake's alleged statements that (1) Plaintiff "would be accepting his current pension calculations as they were" if he wanted to retire under the SIP offer, but (2) if he revoked the offer and remained employed with Ford, they would "work on fixing" the CSF issue. (FAC ¶¶ 64, 203-04.) Plaintiff contends that Ford was incorrect regarding the first point and misrepresented the "level of advocacy and attention it would provide and/or dedicate to the issue, as well as the likelihood of a favorable resolution" with regard to the second statement. (Id. ¶ 204.) Plaintiff also claims that, "inconsistent with prior statements," Ford "chose to administer Plaintiff's CSF benefits as if a Participant could be opted-out of actively contributing to the CSF absent a signed opt-out

election" and "falsely claimed that Plaintiff had requested an opt-out of contributing to the CSF." (*Id.* ¶¶ 200-01.)

To assert a claim for equitable estoppel under § 502(a)(3) successfully, a plaintiff must establish: (1) conduct or language amounting to a representation of material fact; (2) awareness of the true facts by the party to be estopped; (3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended; (4) unawareness of the true facts by the party asserting the estoppel; and (5) detrimental and justifiable reliance by the party asserting the estoppel on the representation. *See Bloemker v. Laborer's Local 265 Pension Fund*, 605 F.3d 436, 442 (6th Cir. 2010). However, "[p]rinciples of estoppel ... cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998) (en banc); *see also Donati v. Ford Motor Co., Gen. Ret. Plan, Ret. Comm.*, 821 F.3d 667, 674-75 (6th Cir. 2016) (citing *Sprague* and holding same). This is because a "party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents," and "to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves," which would be inconsistent with ERISA. *Sprague*, 133

27

F.3d at 404. Therefore, if the plaintiff is attempting to "invoke equitable estoppel in the case of unambiguous pension plan provisions," he must demonstrate three *additional* elements: "[(6)] a written representation; [(7)] plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and [(8)] extraordinary circumstances in which the balance of the equities strongly favors the application of estoppel." *Bloemker*, 605 F.3d at 444. These three additional requirements serve as a "narrow exception" to the general rule that "estoppel can only be invoked in the context of ambiguous plan provisions." *See Donati*, 821 F.3d at 675; *Sprague*, 133 F.3d at 404.

Defendants argue that Plaintiff cannot meet that narrow exception here. Specifically, Defendants contend that the Plan documents regarding calculation of CSF benefits are unambiguous, providing in plain language that "Contributory Service" is "credited service of the Member while making contributions to the Retirement Fund." (Defs.' Mot. at 19, PgID 149, citing Plan, Ex. A., at PgID 164.) Defendants assert that Plaintiff fails to identify any ambiguity in this provision, and thus to prevail on an equitable estoppel claim, he must demonstrate the traditional estoppel elements and the additional factors provided in the narrow exception discussed above, which he cannot do. (*Id.*) Defendants contend that Ford has acted at all times in a manner *consistent with* the statements attributed to Blake and that it never represented that Plaintiff would be credited with the 2004 to 2017 CSF

28

contributions, and thus there is no "inconsistent conduct" to be estopped. (*Id.* at 20, PgID 150.) Rather, according to Defendants, the statement Plaintiff attributed to Blake merely stated that if Plaintiff stayed at Ford, he and Ford would work on addressing the CSF issue, and Ford subsequently did that—investigating Plaintiff's claim and restarting his CSF contributions. (*Id.* at 21, PgID 151.) Further, Defendants continue, Blake's alleged representations were not made in writing, as required in the case of unambiguous documents. (*Id.* at 22-23, PgID 152-53.) And finally, Plaintiff has failed to show "extraordinary circumstances" to warrant equitable relief. (*Id.* at 23-24, PgID 153-54.)[4]

In response, Plaintiff argues that he sufficiently alleges statements by Blake that "induced [Plaintiff] to withdraw his special early retirement application so that Ford could work on 'fixing' his pension miscalculations, directly leading to the loss of those special retirement benefits" and that Ford's subsequent actions, including "misstating the 'opt-out' card; closing his claim without ever notifying him; and

---

[4] Defendants further assert, in a footnote, that, to the extent Plaintiff suggests his equitable estoppel claim extends to recovery of forgone SIP benefits, and "benefits he would have been entitled to" under various later Ford retirement offerings, that claim "fails on its face, as the FAC makes clear that Plaintiff never completed the steps necessary to join the SIP or similar retirement incentive programs." (Defs.' Mot. at 19, n. 7, PgID 149, citing *Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 990 (6th Cir. 2009) (employee fails to demonstrate that former employer violated her rights under ERISA by denying enhanced severance benefits where the employee did not sign a waiver and release agreement as required for enhanced benefits under the plan).) Plaintiff did not respond to this argument.

secretly re-enrolling him [in the CSF plan]," "buttress the fact that Ford was not serious about resolving [Plaintiff's] retirement issue." (Pl.'s Resp. at 21, PgID 272.) Plaintiff asserts that he has sufficiently pleaded plausible facts establishing the five required elements of equitable estoppel, and that the additional elements set forth in *Bloemker* do not apply because the alleged statements induced Plaintiff to forego the SIP, which is not a pension plan. (*Id.* at 22-25, PgID 273-76.)

First, contrary to Defendants' argument, Plaintiff has sufficiently alleged, for purposes of this motion to dismiss, a "misrepresentation" in support of his equitable estoppel claim—Blake's alleged statement that if Plaintiff "revoked his election of the SIP offer, and remained employed with Ford, they would 'work on fixing it,' as in correcting the missing CSF contribution for Plaintiff." (FAC ¶ 64; see also *id.* ¶¶ 68, 70, 88, 102-04.) While Defendants argue that Plaintiff has alleged no "misrepresentation" and that Blake's alleged statement that he would "work on fixing" the CSF issue is accurate, as Ford investigated Plaintiff's claim and restarted his CSF contributions, and that Plaintiff is simply dissatisfied with the outcome of that investigation and Ford's "level of advocacy and attention," for purposes of this motion, and "constru[ing] the complaint in the light most favorable to the plaintiff, accept[ing] its allegations as true, and draw[ing] all reasonable inferences in favor of the plaintiff," *Handy-Clay*, 695 F.3d at 538, Plaintiff's FAC alleges enough facts

to make it plausible that Blake's statements could be construed as misrepresenting to Plaintiff that the CSF issue would be "fix[ed]."

However, Plaintiff's equitable estoppel claim nevertheless fails, as this claim involves unambiguous plan provisions and Plaintiff's FAC fails to allege all necessary elements of an equitable estoppel claim under these circumstances. As Defendants explain, the Plan documents regarding the calculation of CSF benefits are unambiguous, providing in plain language that "Contributory Service" is "credited service of the Member while making contributions to the Retirement Fund." (Defs.' Mot. at 19, PgID 149, citing Plan at Ex. 1, ECF No. 15-1 at 17, PgID 164.) Plaintiff raises no argument as to ambiguity in his response. Therefore, as Defendants correctly argue, Plaintiff must demonstrate the traditional estoppel elements *and* the additional factors required in the case of unambiguous plan provisions.

Plaintiff only argues in response that the additional factors in *Bloemker* do not apply to his claim because the alleged misrepresentations induced him to forego the SIP retirement package, which is not a pension plan. (Pl.'s Resp. at 24-25, PgID 275-76.) Plaintiff is incorrect for two reasons. First, as Defendants point out, Plaintiff's contention "improperly recasts the FAC's allegations and the fundamental basis of Plaintiff's estoppel claim" which "alleges that Ford should be estopped from denying enhanced *CSF benefits*" based on Blake's alleged misrepresentations, and

the CSF is part of the Plan. (Defs.' Reply at 5-6, PgID 313-14, citing FAC ¶¶ 64, 203-05.) In any event, the additional equitable estoppel elements are not limited to unambiguous pension plan provisions. The court in *Bloemker* extended ERISA equitable estoppel claims to pension benefit plans (in addition to welfare benefit plans) and articulated a narrow exception to the general principal that estoppel cannot be applied to vary the terms of unambiguous plan documents, but it did not expressly limit the exception and the three additional factors to pension benefit cases. *See Bloemker*, 605 F.3d at 440 (noting that the Sixth Circuit "ha[d] not previously recognized equitable estoppel as a viable claim in the pension benefit— as opposed to the welfare benefit—context"); *see also Teisman v. United of Omaha Life Ins. Co.*, 908 F.Supp.2d 875, 886 (W.D. Mich. 2012) ("While the Sixth Circuit was referring in particular to pension plan provisions [in articulating the three additional factors], it is logical that the reasoning also extends to life insurance plan provisions."). Indeed, courts in this district and within the Sixth Circuit have applied the narrow exception and additional factors set forth in *Bloemker* to claims involving plans other than pension plans. *See, e.g., Haviland v. Metropolitan Life Ins. Co.*, 730 F.3d 563, 569 (6th Cir. 2013) (applying additional *Bloemker* factors to claim that employer falsely promised that continuing life insurance benefits would not be reduced for the rest of their lives); *Alquahwagi v. Shelby Enter., Inc.*, No. 14-13691, 2016 WL 4771329, at *8 (E.D. Mich. Sept. 14, 2016) (applying additional *Bloemker*

32

factors to claim for optional life insurance benefits); *Executors of the Estate of Lewis E. Wallner v. Unum Life Ins. Co. of Am.*, 221 F.Supp.3d 967, 974 (N.D. Ohio 2016) (applying *Bloemker* factors to claim for life insurance benefits); *Ford v. Owens-Illinois, Inc.*, 961 F.Supp.2d 857, 874 (N.D. Ohio 2012) (applying *Bloemker* factors to claim for enhanced retirement benefits).

Defendants correctly argue that Plaintiff's FAC fails to plead allegations supporting the first and third "additional" factors.[5] Looking at the first additional factor in the case of unambiguous plan provisions—that the alleged representation be in writing—Plaintiff's estoppel claim fails. Plaintiff does not plead that Blake's alleged misrepresentations were made in writing. (See FAC ¶¶ 63-64 (claiming that Plaintiff "personally met with Mr. Blake" who "informed" him of his option to separate under the SIP or stay at Ford and work on the issue).) Similarly, Ford's alleged representations (via the NESC) that Plaintiff had "opted out" of the CSF were made orally. (See FAC ¶¶ 57-58 (Plaintiff was "informed" "during [a] call" that "records were showing that [Plaintiff] had 'opted-out' of the CSF in or around April 2004").) These oral representations could not have altered the terms for

---

[5] Defendants do not address the second *Bloemker* factor – Plaintiff's ability to calculate his own benefits – and there does not appear to be sufficient evidence before the Court as to whether the Plan provisions are complicated enough that it did not allow for individual calculation of benefits.

calculating CSF credit as set forth in the Plan, and Plaintiff therefore fails to adequately plead an equitable estoppel claim.

Defendants also correctly contend that Plaintiff fails to plead "extraordinary circumstances" warranting equitable relief. (Defs.' Mot. at 23-24, PgID 153-54.) Plaintiff does not address this argument in his response. In *Bloemker*, the Sixth Circuit found sufficient "extraordinary circumstances" to avoid dismissal where the retiree received and relied on benefits for two years before the plan tried to recoup mistaken overpayments. *Bloemker*, 605 F.3d at 444. However, in *Donati*, the Sixth Circuit found the circumstances *not* extraordinary when the plan miscalculated the size of plaintiff's lump sum payment of retirement benefits—paying \$38,840 despite the fact the plan had initially promised a lump-sum payment of \$230,361—because "the Committee's miscalculation of benefits did not detrimentally induce Donati to make a decision that she would not have otherwise made." *Donati*, 821 F.3d at 675. The Court rejected the argument that reliance on misinformation in retirement and estate planning alone constitutes extraordinary circumstances. *Id.* (citing *Haviland*, 730 F.3d at 567, 569 (holding circumstances not extraordinary when "MetLife falsely promised that [the plaintiffs'] continuing life insurance benefits would not be reduced for the rest of their lives, when in fact their benefits were reduced to \$10,000," and "these false promises affected the plaintiffs' retirement and estate

34

planning decisions")). Plaintiff's equitable estoppel claim thus also fails for his failure to plead this third factor.

Accordingly, Defendants' motion to dismiss Plaintiff's equitable estoppel claim in Count III is GRANTED and that claim is DISMISSED.

## D. Fiduciary or Ministerial Capacity of Blake's Representations (Count III)

Defendants argue that the representations Plaintiff complains in support of his ERISA § 502(a)(3) breach of fiduciary duty claim in Count III were made by Blake in a ministerial capacity and thus cannot support Plaintiff's claim. (Defs.' Mot. at 24-25, PgID 154-55.) Specifically, Defendants contend that "[a]ll of the statements Plaintiff alleges were made in service of 'purely ministerial functions' like applying plan eligibility rules, calculating service and compensation credits, and 'advising participants of their rights and options.'" (*Id.* at 24, PgID 154, quoting 29 C.F.R. § 2509.75-8 D-2.) Plaintiff responds that Blake's statements constituted fiduciary representations because he was communicating on behalf of Ford, a fiduciary, and "conveying information about the likely future of plan benefits [is] a discretionary act of plan administration" giving rise to a fiduciary duty. (Pl.'s Resp. at 23, PgID 274, quoting *Sprague*, at 405 (quoting *Varity*, 516 U.S. at 502-04, internal quotation marks omitted).) Plaintiff asserts that he received incorrect advice which gave rise to a fiduciary liability.

"The fiduciary obligations imposed by ERISA are implicated only where an employer acts in its fiduciary capacity" by performing "discretionary acts of plan management" or "acts designed to carry out the very purpose[] of the plan." *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 718 (6th Cir. 2000) (internal quotation marks omitted). 29 U.S.C. § 1002(21)(A) provides the following definition of fiduciaries:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan....

A Department of Labor interpretive bulletin further explains that a person without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA. 29 C.F.R. § 2509.75-8 D-2.

Plaintiff pleads that Ford is an ERISA "fiduciary" (FAC ¶ 11) and contends that Blake's statements, as Ford's HR representative, constituted fiduciary representations because they "'convey[ed] information about the likely future of plan benefits,'" referring to Blake's alleged statement that he would "work on fixing" Plaintiff's CSF credits. (Pl.'s Resp. at 23, PgID 274.) As the Sixth Circuit

36

explained in *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 719 (6th Cir. 2000), "'it is not the exercise of discretion alone that makes an employer's action subject to fiduciary standards[;]'" "[r]ather, the exercise of discretion must relate to *plan management or administration*." (emphasis added). Further, the Sixth Circuit "employs a functional test to determine fiduciary status." *Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006) (citing *Hamilton v. Carell*, 243 F.3d 992, 998 (6th Cir. 2001)). Accordingly, "'[f]iduciary status ... is not an all or nothing concept,'" and therefore the court must "'ask whether a person is a fiduciary with respect to the particular activity in question.'" *Briscoe*, 444 F.3d at 486 (quoting *Moench v. Robertson*, 62 F.3d 553, 561 (3d Cir. 1995), *overruled on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014); *see also Hamilton*, 243 F.3d at 998 (explaining "the need to examine the conduct at issue when determining whether an individual is an ERISA fiduciary")).

Here, construing the FAC in the light most favorable to Plaintiff, accepting the allegations as true and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has sufficiently alleged that Blake, on behalf of Ford, was acting in a fiduciary capacity when he stated that he would "work on fixing" the CSF issue. Plaintiff's allegations that Ford is a fiduciary and Blake's alleged statements regarding administration of the Plan and Plaintiff's CSF contributions plausibly appear to demonstrate the exercise of discretion that "relate[s] to plan management

or administration." As such, Plaintiff has sufficiently pleaded that Blake was acting in a fiduciary capacity under ERISA with regard to Plaintiff's eligibility for CSF credits. Therefore, Defendants' motion to dismiss Plaintiff's breach of fiduciary duty claim in Count III predicated on Blake's alleged statements is DENIED.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART. Specifically, Defendants' motion to dismiss Plaintiff's claim under ERISA § 502(a)(2) in Count II, to the extent it challenges Ford's denial of Plaintiff's request for CSF credit rather than its underlying removal of him from the program, is GRANTED and that claim is DISMISSED because it is in essence a "repackaged" § 502(a)(1)(B) denial-of-benefits claim. In addition, Defendants' motion to dismiss Plaintiff's equitable estoppel claim in Count III is GRANTED and that claim is DISMISSED because Plaintiff failed to plead all essential elements of that claim. However, Defendants' motion to dismiss Count II of Plaintiff's FAC in its entirety based on the statute of limitations is DENIED, as is Defendants' motion to dismiss those portions of Count III premised on Blake's alleged statements.

IT IS SO ORDERED.

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: DEC 2 6 2019

38